IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FARMERS INSURANCE EXCHANGE,
MID-CENTURY INSURANCE COMPANY,
TRUCK INSURANCE EXCHANGE, COAST
NATIONAL INSURANCE COMPANY, 21ST
CENTURY CENTENNIAL INSURANCE
COMPANY, FARMERS INSURANCE
COMPANY OF WASHINGTON, FARMERS          3:13-cv-01883-PK
INSURANCE COMPANY OF OREGON, 21ST
CENTURY PACIFIC INSURANCE
COMPANY, and 21ST CENTURY
INSURANCE COMPANY,                       FINDINGS AND
                                         RECOMMENDATION

                 Plaintiffs,

v.

FIRST CHOICE CHIROPRACTIC &
REHABILITATION, SUNITA BHASIN,
DAVID PETROFF, KELLY COLEY, DAVID
AVOLIO, JOEL INGERSOLL, SEAN ROBINS,
PARDIS TAJIPOUR, MARCUS COOL,
AARON DAVISON, and AJAY
MOHABEER,

                 Defendants.

---

Page 1 - FINDINGS AND RECOMMENDATION

FIRST CHOICE CHIROPRACTIC &
REHABILITATION, SUNITA BHASIN,
DAVID PETROFF, KELLY COLEY, and
PARDIS TAJIPOUR,

               Counter-Claimants,

v.

FARMERS INSURANCE EXCHANGE,
MID-CENTURY INSURANCE COMPANY,
TRUCK INSURANCE EXCHANGE, COAST
NATIONAL INSURANCE COMPANY, 21ST
CENTURY CENTENNIAL INSURANCE
COMPANY, FARMERS INSURANCE
COMPANY OF WASHINGTON, FARMERS
INSURANCE COMPANY OF OREGON, 21ST
CENTURY PACIFIC INSURANCE
COMPANY, and 21ST CENTURY
INSURANCE COMPANY,

               Counter-Defendants.

---

PAPAK, Magistrate Judge:

      Plaintiff-insurance companies initiated the instant action on October 22, 2013, alleging

that First Choice Chiropractic & Rehabilitation ("First Choice") submitted fraudulent insurance

claims with the aid of its staff and an outside medical doctor.  Now before the court are

defendants First Choice, Dr. Sunita Bhasin, Kelly Coley, David Petroff, and Dr. Pardis Tajipour's

motion to dismiss and motion to strike (#19), defendant Dr. Marcus Cool's motion to dismiss and

motion to strike (#22), defendants Dr. Aaron Davison, Dr. Joel Ingersoll, and Dr. Sean Robins's

motion to dismiss and motion to strike (#28), and defendant Dr. Ajay Mohabeer's motion to

dismiss and motion to strike (#34).  For the reasons set forth below, the motions should be

granted in part and denied in part and plaintiffs' demand for $2,096,926 in damages relating to

third-party claims should be dismissed without prejudice and with leave to amend.

## FACTUAL BACKGROUND[1]

Plaintiffs are nine insurance companies licensed and engaged in the business of providing automobile insurance in the State of Oregon. First Amended Complaint ("Complaint"), #10, ¶ 23. Pursuant to the Oregon statute governing personal-injury protection ("PIP") benefits, automobile insurers are required to pay up to $15,000 for reasonable and necessary medical expenses incurred by an insured related to a covered motor-vehicle accident. *Id.* ¶ 35. Plaintiffs allege that, "[s]ince at least as early as 2007," First Choice instituted a practice of billing patients with PIP coverage for services that were not medically necessary or were not performed. *Id.* ¶¶ 1-2. Specifically, plaintiffs allege that First Choice targeted individuals that would come to First Choice clinics following a motor-vehicle accident and who had PIP coverage available through various insurance policies. *Id.* First Choice specifically targeted the Hispanic community because it "believed that this group of individuals would be most easily manipulated by [its] staff." *Id.* ¶ 6.

The scheme had three major components. *Id.* ¶ 2. First, First Choice, through its employees, used a "series of 'scripts'" to convince patients that: (1) they were injured, even if they reported no pain; (2) they needed significant medical treatment, even if they did not report any symptoms; (3) they would be permanently injured unless they received care through First Choice; and (4) they needed to continue treatment even if they no longer experienced symptoms. *Id.* If a patient stated that he or she did not wish to receive treatment, First Choice, through its

---

[1] Consistent with the legal standard governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the following takes the complaint's allegations of material fact as true and construes them in the light most favorable to plaintiffs.

employees, would advise the patient of the risks of not receiving treatment, including:

> (1) the patient's pain and suffering claim against the at fault party would be lower; (2) the patient had "100% coverage" for all medical bills, but if he/she did not show up for all treatments required by First Choice, he/she would risk the insurance not paying for bills, and the patient would then be personally responsible; (3) the patient would develop symptoms later, which could include long term or permanent neck/back pain and arthritis; and (4) treatment which should be resolved in 3-4 months would take much longer.

*Id.* ¶ 4.

The second component of the scheme was to generate chart notes and medical records that would, among other things, fabricate symptoms, falsify exam findings, and misrepresent a patient's subjective complaints. *Id.* ¶ 7. This second component began with a patient's initial visit. *Id.* ¶ 8. First Choice, through its employees, would falsify initial intake forms "to make it seem to the insurer that the motor vehicle accident was more significant than it was and/or that symptoms were more significant than actually reported by the patient." *Id.* First Choice instructed its employees that "the initial exam report should always include a diagnosis of at least three regions," which resulted in "virtually all patients get[ting] the same diagnosis of strain/[sprain] to the cervical, thoracic, and lumbar regions." *Id.* ¶ 43. As part of this second component, First Choice referred patients to Dr. Mohabeer, a medical doctor, who would examine the patients and generate reports that contained false and exaggerated findings to support First Choice's predetermined treatment plan. *Id.* ¶ 9.

Finally, the third component of the scheme "was to enact a system of treatment of all patients that would maximize profit by all those involved by focusing on maximum 'capacity' as opposed to providing proper treatment for any individual patient." *Id.* ¶ 10. First Choice

developed a predetermined treatment plan "consisting of a combination of chiropractic manipulations, electric stimulation, laying on a massage table (which [First Choice] improperly bill[ed] as traction . . . ), massage, [and] later adding in exercise therapy, regardless of the unique circumstances and needs of each patient." *Id.* ¶ 11.  To maximize the number of patients that could be seen on a given day, First Choice instituted "strict time components" to a patient's visit. *Id.* ¶ 12.  A patient's visit typically began with a First Choice staff member obtaining information from the patient regarding any subjective complaints, "followed by two minutes or less of total time with the chiropractor," and then the patient would be "handed off to staff members" who performed the "treatment," which generally entailed laying down on a "'rolling table'" with a heated blanket and electrical stimulus patches on the patient's back or neck. *Id.* ¶ 45.  "[T]he patient [would] then have fifteen unattended minutes with the heated blanket, electrical stimulus machine on, and rolling table roller(s) activated." *Id.*  First Choice would continue this predetermined treatment plan until "the patient [could] no longer be convinced to keep returning, PIP benefits [were] substantially reduced, the PIP insurer cut[] off treatment, or First Choice determine[d] that it [had] billed an amount that [would] likely be the most they [could] bill on a file, and simply release the patient." *Id.* ¶ 44.

Plaintiffs allege that each of the named defendants played a significant role in the scheme. *Id.* ¶ 64.  Specifically, Dr. Bhasin and Petroff, First Choice's co-owners, were responsible for coordinating and controlling the implementation of the different components of the scheme. *Id.* ¶¶ 25-26.  Dr. Bhasin was also responsible for hiring and training all chiropractors and was "involved in directing chiropractors and staff on all aspects of examining, charting, diagnosing, treating, and communicating with patients." *Id.* ¶ 25.  She was also involved in treating or

Page 5 - FINDINGS AND RECOMMENDATION

supervising the treatment of patients and was "involved in decisions as to how long to treat each patient and how much should be billed for each patient." *Id.* Coley, First Choice's office manager, was responsible for training and supervising chiropractors and other First Choice staff, coordinating and implementing the scheme, and "supervis[ing] treatment, charting, billing, and all other areas of staff involvement with each patient." *Id.* ¶ 27. Dr. Avolio, Dr. Ingersoll, Dr. Robins, Dr. Tajipour, Dr. Cool, and Dr. Davison were the chiropractors responsible for making the predetermined diagnoses and ordering the predetermined treatments. *Id.* ¶¶ 28-33. Finally, Dr. Mohabeer assisted in the scheme by falsifying exam findings and "'rubber stamp[ing]'" First Choice's treatment plans. *Id.* ¶ 34. In exchange for Dr. Mohabeer's cooperation, First Choice would continue to refer patients to him. *Id.*

Sometime in 2011, the Oregon Chiropractic Board began investigating First Choice, including using two individuals to act as undercover operatives. *Id.* ¶ 47. "[T]hese two operatives independently contacted First Choice and advised that they were involved in motor vehicle accidents (no such accidents ever occurred)." *Id.* The operatives were first examined by independent chiropractors, who determined that the operatives were healthy. *Id.* Thereafter, the operatives went to a First Choice clinic. *Id.* Although the first operative reported no pain, First Choice submitted to the insurance company exam findings and chart notes indicating that the operative reported that he was in pain and that his pain levels continued through several weeks of treatment. *Id.* ¶ 48. The second operative reported to First Choice that she had "very light pain in her neck only" that lasted approximately five days. *Id.* ¶ 49. However, First Choice submitted chart notes and exam findings to the insurance company indicating that the operative had thoracic pain as well as neck pain and that she was in pain for one to two months. *Id.*

Page 6 - FINDINGS AND RECOMMENDATION

## PROCEDURAL BACKGROUND

Plaintiffs filed the instant action on October 22, 2013. In the complaint (#10), plaintiffs plead claims against all defendants for: (1) common-law fraud; (2) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (3) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (4) violation of the Oregon Racketeer Influenced and Corrupt Organizations Act ("ORICO"); (5) violation of the Oregon Unfair Trade Practices Act ("UTPA"); and (6) unjust enrichment. Plaintiffs request damages "of at least $3,686,087.00 with respect to PIP benefits alone" and "of at least $2,096,926.00 with respect to third party claims involving First Choice patients." Complaint, #10, ¶ 55. In their seventh claim for relief, plaintiffs request declaratory judgment that defendants are not entitled to payment for bills currently pending.

On March 21, 2014, defendants First Choice, Dr. Bhasin, Coley, Petroff, and Dr. Tajipour filed a motion to dismiss and motion to strike (#19). Thereafter, defendants Dr. Cool, Dr. Davison, Dr. Ingersoll, Dr. Robins, and Dr. Mohabeer filed motions (#22, #28, and #34), seeking to join in defendants First Choice, Dr. Bhasin, Coley, Petroff, and Dr. Tajipour's motion to dismiss and motion to strike.[2] On April 7, 2014, plaintiffs filed a resistance (#30) to the motion to dismiss and motion to strike. Defendants filed their reply (#31) in support of the motion to dismiss and motion to strike on April 24, 2014. On May 5, 2014, the court heard oral argument on the motions. The matter is fully submitted and ready for decision.

/ / /

---

[2] For ease of reading, I shall refer to defendants First Choice, Dr. Bhasin, Coley, Petroff, Dr. Tajipour, Dr. Cool, Dr. Davison, Dr. Ingersoll, Dr. Robins, and Dr. Mohabeer as "defendants." I note that one of the defendants named in the complaint, Dr. Avolio, has yet to enter an appearance and, thus, did not join in the motion to dismiss and motion to strike.

## DISCUSSION

In the motion to dismiss and motion to strike, defendants first request that the court dismiss plaintiffs' first, second, third, fourth, fifth, and sixth claims in their entirety and dismiss in part plaintiffs' seventh claim. Defendants further request that the court strike paragraphs 1 through 18 as redundant and paragraphs 17 and 54 as impertinent and immaterial.

## I.     Motion to Dismiss

### A.     Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, a complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* (citation omitted). Instead, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In ruling on a Rule 12(b)(6) motion to dismiss, a court must take the complaint's allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 224 (9th Cir. 1994). Moreover, the "court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

*/ / /*

Page 8 - FINDINGS AND RECOMMENDATION

B.    Analysis

Defendants moves to dismiss on several grounds. First, defendants argue that dismissal is proper because plaintiffs fail to state plausible claims to relief as required under Federal Rule of Civil Procedure 8(a). Second, defendants alternatively contend that dismissal is proper because plaintiffs fail to plead their claims with the specificity required under Federal Rule of Civil Procedure 9(b). Third, defendants request that, if the court finds that plaintiffs properly pleaded their claims under Rules 8(a) and 9(b), plaintiffs' claims are barred in part by the statute of limitations applicable to each claim. Finally, defendants argue that the court must dismiss plaintiffs' demand for $2,096,926 in damages relating to third-party claims because there are no facts in the complaint relating to third-party claims.

1.    **Failure to State a Claim**

Defendants first contend that dismissal is appropriate on the basis that plaintiffs fail to state plausible claims to relief. Defendants argue that plaintiffs' first, second, third, fourth, fifth, and sixth claims are implausible and must be dismissed in their entirety and plaintiffs' seventh claim, requesting declaratory relief, must be limited to allegedly fraudulent bills submitted after August 22, 2013. Defendants further contend that plaintiffs' first and fifth claims, alleging common-law fraud and a violation of the UTPA, should be dismissed on the additional ground that plaintiffs have failed to adequately plead justifiable reliance.

a.    **First, Second, Third, Fourth, Fifth, and Sixth Claims**

Under Oregon Revised Statute ("ORS") § 742.524(1), a PIP insurer has sixty days within which to send a notice of denial to a provider, after which medical services are presumed to be reasonable and necessary. In this case, defendants contend that, because plaintiffs did not

challenge the allegedly fraudulent medical bills from First Choice within the sixty days provided

for under ORS § 742.524(1), the bills are presumptively reasonable. Moreover, defendants argue

that, in the complaint, plaintiffs allege that the insurance claims at issue are fraudulent on their

face. According to defendants, this "begs" the question of, "why, year after year, did [plaintiffs]

not challenge facially fraudulent invoices it had a duty to investigate knowing they would be

deemed presumptively valid by statute?" Defendants' Reply, #31, at 3. Accordingly, defendants

request that the court dismiss plaintiffs' first, second, third, fourth, fifth, and sixth claims as

implausible. In response, plaintiffs argue that defendants misconstrue ORS § 742.524(1), which

plaintiffs argue creates a *rebuttable* presumption that medical services were medically necessary

and reasonable. Moreover, plaintiffs contend that the rebuttable presumption provided for under

ORS § 742.524(1) "does not contemplate fraud." Plaintiffs' Resistance, #30, at 7.

      I find that plaintiffs have stated plausible claims to relief as required under Rule 8(a).

Defendants primarily seize on plaintiffs' allegation that the fraud is apparent given the "pervasive

patterns" clearly demonstrating that the medical bills are "not credible." Complaint, #10, ¶ 43.

Contrary to defendants' suggestion, however, plaintiffs do not allege that each bill is fraudulent

on its face. Rather, the complaint suggests that, viewing the hundreds or thousands of bills and

supporting documentation together, First Choice's fraudulent practice of giving virtually identical

diagnoses to all patients and prescribing virtually identical treatment plans for all patients is

apparent. I am likewise unpersuaded that ORS § 742.524(1) compels dismissal. As plaintiffs

argue, and as defendants acknowledge, the presumption under ORS § 742.524(1) is rebuttable

and plaintiffs have pleaded sufficient facts to rebut any presumption as to the reasonableness or

necessity of the medical services First Choice provided. Thus, defendants' motion to dismiss

plaintiffs' first, second, third, fourth, fifth, and sixth claims on the ground that such claims are implausible should be denied.

### b.    Seventh Claim

Next, defendants argue that the court must dismiss in part plaintiffs' seventh claim, which requests that the court declare that defendants are not entitled to payment on pending insurance claims. Defendants contend that their "plausibility argument applies with equal force to unpaid bills [plaintiffs] failed to challenge within 60 days of their submission." Defendants' Motion to Dismiss and Motion to Strike, #19, at 10. Accordingly, defendants maintain that the court must dismiss plaintiffs' seventh claim to the extent it seeks relief on unpaid bills submitted prior to August 22, 2013—that is, all pending bills not challenged within the sixty-day period provided for under ORS § 742.524(1).

For the reasons set forth above, I find that plaintiffs have pleaded facts sufficient to rebut any presumption arising under ORS § 742.524(1). Plaintiffs have plausibly alleged that, given defendants' practice of billing for services that were not provided or were not medically necessary, defendants are not entitled to payment for pending claims. Thus, defendants' request to dismiss in part plaintiffs' seventh claim on the ground that it is implausible should be denied.

### c.    Justifiable Reliance

Next, defendants argue that plaintiffs' first and fifth claims, alleging common-law fraud and violation of the UTPA, respectively, must be dismissed because plaintiffs do not plausibly plead that they justifiably relied on defendants' alleged misrepresentations. Defendants contend that plaintiffs' allegations "beg[]" the question, "How did [plaintiffs] rely, for years, on facially fraudulent invoices it was statutorily obligated to investigate and contemporaneously challenge?"

Defendants' Motion to Dismiss and Motion to Strike, #19, at 11.  Plaintiffs respond that their reliance on defendants' chart notes and bills was reasonable, as each medical bill "includes a sworn statement, under oath, that the treatment billed for in fact occurred."  Plaintiffs' Resistance, #30, at 8.

Under Oregon law,

> [t]he essential elements of a common-law fraud claim are: the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance.

*Strawn v. Farmers Ins. Co. of Or.*, 350 Or. 336, 351-52, 258 P.3d 1199, 1209 (Or. 2011); *see also Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078, 1080 (Or. 1976).  Likewise, a plaintiff alleging a violation of the UTPA must "prove that he or she relied on the defendant's representation if the representation takes the form of an affirmative misstatement of a fact." *Pearson v. Philip Morris, Inc.*, 257 Or. App. 106, 142, 306 P.3d 665, 686 (Or. Ct. App. 2013), *petition for review granted*, 354 Or. 699, 319 P.3d 696 (Or. 2014).

In this case, I find that plaintiffs have plausibly alleged that they reasonably relied on defendants' misrepresentations in the chart notes and medical bills when issuing payments. Again, defendants misconstrue plaintiffs' complaint, suggesting that plaintiffs allege that each bill is fraudulent on its face.  The complaint, however, alleges only that defendants' practice of giving all patients nearly identical diagnoses and prescribing all patients nearly identical treatment plans is apparent when viewing the bills together.  As discussed below in connection with defendants' statute-of-limitations argument, it is premature to decide when plaintiffs were aware, or should

have been aware, of defendants' alleged fraudulent scheme.  If plaintiffs continued paying

defendants' insurance claims after plaintiffs were aware, or should have been aware, of the

scheme, defendants are, of course, free to argue that plaintiffs' reliance on defendants' alleged

misrepresentations in the chart notes and bills was not reasonable.  However, at this stage in the

proceedings, plaintiffs need only plausibly allege justifiable reliance, and I find that they have

done so.  Thus, defendants' motion to dismiss plaintiffs' first and fifth claims on the basis that

plaintiffs fail to plausibly plead justifiable reliance should be denied.

### 2.    Rule 9(b)

Alternatively, defendants request that the court dismiss the first, second, third, fourth,

fifth, and sixth claims on the basis that plaintiffs fail to plead the alleged fraud with the

specificity required under Rule 9(b).[3]  Defendants contend that,

> in cases where an insurance company accuses a medical provider
> of a long-term fraudulent billing scheme, federal courts typically
> find Rule 9(b) satisfied when the complaint proffers details—such
> as the date, the patient, the treating medical provider(s), the claim
> number, the amount billed, the basis for fraud—about every single
> fraudulent bill.

Defendants' Motion to Dismiss and Motion to Strike, #19, at 12-13.  Defendants maintain that

plaintiffs' complaint falls considerably short of the Rule 9(b) standard, containing only "general,

sweeping allegations of fraud" over a multi-year period.  *Id.* at 15.  Specifically, defendants argue

that plaintiffs' complaint is lacking critical information, including: (1) the name of each patient;

(2) the medical condition for which the patient received treatment; (3) the treatment provided to

---

[3] Defendants do not appear to request that the court dismiss plaintiffs' seventh claim on
this ground.  *See* Defendants' Motion to Dismiss and Motion to Strike, #19, at 10 ("What should
remain of this case is a single claim for declaratory relief as to unpaid bills submitted after
August 22, 2013, 60 days before [plaintiffs] initiated this lawsuit.").

Page 13 - FINDINGS AND RECOMMENDATION

the patient; (4) when such treatment was provided; (5) which defendant(s) provided the patient's treatment; (6) which defendant(s) wrote, reviewed, and sent each bill or other documentation to plaintiffs; (7) the claim number; (8) the date of the allegedly fraudulent bill or other documentation; (9) how First Choice or any other defendant represented that services set forth in the submitted bills were medically necessary (as opposed to representing simply that they were performed); and (10) why, if it was performed, each treatment was not medically necessary for each allegedly fraudulent submission. *See id.* at 15-16.

In response, plaintiffs argue that they have pleaded their claims with the particularity required under Rule 9(b), as evidenced by their twenty-five-page recitation of the facts outlining defendants' fraudulent scheme. Plaintiffs argue that they need not identify each false statement made by each and every defendant but, rather, need only identify the role of each defendant in the scheme. Finally, plaintiffs argue that the cases defendants cite "are all out of state federal district court cases, many of which are unpublished," and that defendants rely on a "heightened pleading standard specific to securities fraud cases." Plaintiffs' Resistance, #30, at 8.

Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Rule 9(b) particularity requirement is satisfied if the pleading "identifies the circumstances constituting fraud so that [the] defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). That is, the allegations must be sufficiently specific "to give defendants notice of the particular misconduct which is alleged to constitute the fraud . . . so that they can defend against the charge

and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). A complaint is sufficient to give a defendant such notice when it identifies "'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (quoting *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). Rule 9(b)'s heightened standard applies to all claims that "'sound in fraud.'" *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) ("In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." (citations omitted)).

In *United States ex rel. Lee v. SmithKline Beecham, Inc.*, the Ninth Circuit applied Rule 9(b)'s pleading standard to a complaint alleging a multi-year fraudulent scheme in which the defendant, SmithKline, falsified test results when the they "fell outside the acceptable standard of error" and then "billed Medicare for these allegedly worthless tests and falsely certified the payment requests that it sent to the government." 245 F.3d 1048, 1050 (9th Cir. 2001). Although the Ninth Circuit ultimately concluded that the plaintiff did not satisfy the Rule 9(b) standard because he "did not specify the types of tests implicated in the alleged fraud, identify the SmithKline employees who performed the tests, or provide any dates, times, or places the tests were conducted," the Ninth Circuit cautioned that "Rule 9(b) may not require [the plaintiff] to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period." *Id.* at 1050-51; *see also U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir.

Page 15 - FINDINGS AND RECOMMENDATION

2009) (finding that, in the context of a False Claims Act case, "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates" to satisfy Rule 9(b)'s heightened pleading standard but, rather, may "survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted"); *Cooper v. Pickett*, 137 F.3d 616, 626-27 (9th Cir. 1997) (finding that, in the context of a fraud case in which the defendant-company allegedly overstated its revenue by reporting consignment transactions as sales, the complaint need not "allege specific shipments to specific customers at specific times with a specific dollar amount of improperly recognized revenue" to survive Rule 9(b)).

In this case, I find that plaintiffs have pleaded their claims with the specificity required under Rule 9(b). Plaintiffs have identified the particular role that each of the named defendants played in the scheme. *See Swartz*, 476 F.3d at 765 ("In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[] in the alleged fraudulent scheme.'" (alterations in original) (quoting *Moore*, 885 F.2d at 541)). Plaintiffs have further identified the fraudulent statements at issue, including, for example, statements that medical services were provided when, in fact, they were not (as in the case of "traction") and statements that treatment was medically necessary when, in fact, it was not. Moreover, plaintiffs have clearly set forth a theory as to how the fraudulent scheme operated, including a detailed analysis of the three components of the "protocol" instituted by First Choice and its staff. Although plaintiffs allege only a general time frame during which defendants submitted fraudulent insurance claims, this is sufficient under the circumstances where plaintiffs allege a seven-year-long fraud involving hundreds or thousands of claims. *See Lee*, 245 F.3d at

Page 16 - FINDINGS AND RECOMMENDATION

1051.  Finally, plaintiffs have alleged that the fraud took place in the First Choice clinics where First Choice's staff prepared false exam reports and chart notes, performed medically unnecessary treatment, and prepared the fraudulent insurance claims.  In short, plaintiffs have sufficiently set forth the "who, what, when, where, and how" of the fraud.

Defendants' arguments to the contrary are unpersuasive.  Specifically, defendants' suggestion that plaintiffs must include information such as each patient's name, the claim number, the billing number, and so forth is essentially a request for plaintiffs to prove their case at the pleadings stage.  *See Grubbs*, 565 F.3d at 190 (noting that, in the context of a False Claims Act case, a plaintiff need not plead "the exact dollar mounts, billing numbers, or dates" because "[t]o require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates").  Moreover, as plaintiffs note, the cases that defendants rely on in support of their argument that such specificity is required are not binding authority.  I further note that three of the cases—*State Farm Mutual Automobile Insurance Co. v. Kugler*, No. 11-80051, 2011 WL 4389915 (S.D. Fla. Sept. 21, 2011), *Allstate Insurance Co. v. Rozenberg*, 590 F. Supp. 2d 384 (E.D.N.Y. 2008), and *Aiu Insurance Co. v. Olmecs Medical Supply, Inc.*, No. CV-04-2934 (ERK), 2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005)—only state that the plaintiffs pleaded their claims with sufficient particularity and do not set forth any "minimum requirements" to allege an insurance-fraud case.

In sum, I find that the complaint passes muster under Rule 9(b), as it gives defendants sufficient "notice of the particular misconduct which is alleged to constitute the fraud . . . so that they can defend against the charge and not just deny that they have done anything wrong."

*Semegen*, 780 F.2d at 731.  Accordingly, defendants' motion to dismiss should be denied to the

extent it requests dismissal for failure to plead with the specificity required under Rule 9(b).[4]

### 3.      Statute of Limitations

Next, defendants argue that plaintiffs' claims are barred in part under the statute of

limitations applicable to each claim.  Specifically, defendants argue that, because plaintiffs have

alleged that the fraudulent nature of each bill is apparent on its face, plaintiffs should have

discovered the fraud on the date that each bill was received.  Thus, defendants argue that,

because there is a two-year statute of limitations for common-law fraud claims, plaintiffs' first

claim must be dismissed insofar as it is "based on conduct before October 22, 2011—two years

before the date [plaintiffs] initiated this action."  Defendants' Motion to Dismiss and Motion to

Strike, #19, at 21.  Defendants further contend that, because there is a four-year statute of

limitations for RICO claims, plaintiffs' second and third claims must be dismissed insofar as they

are "based on conduct preceding October 22, 2009, four years before [plaintiffs] filed suit."  *Id.* at

24.  Likewise, defendants argue that, because there is a five-year statute of limitations for ORICO

claims, plaintiffs' fourth claim must be dismissed insofar as it is "based on conduct preceding

October 22, 2008, five years before [plaintiffs] filed suit."  *Id.*  Defendants also argue that

---

[4] I note that, even if plaintiffs had failed to adequately plead their claims, I would
recommend granting plaintiffs leave to file an amended complaint pursuant to Federal Rule of
Civil Procedure 15(a). *See* Fed. R. Civ. P. 15(a) (noting that leave to amend should be freely
given); *Lee*, 245 F.3d at 1052 ("We consistently have held that leave to amend should be granted
unless the district court 'determines that the pleading could not possibly be cured by the
allegation of other facts.'" (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000))).
Indeed, in their resistance, plaintiffs note that "should the [c]ourt require additional specification,
such as a damages spreadsheet organized by patient/insured, [plaintiffs] request[] leave to
amend."  Plaintiffs' Resistance, #30, at 10.  Such a spreadsheet would surely resolve any doubt
that plaintiffs have satisfied Rule 9(b).

Page 18 - FINDINGS AND RECOMMENDATION

plaintiffs' fifth claim, alleging a violation of the UTPA, must be limited to conduct occurring before October 22, 2012, in light of the UTPA's one-year statute of limitations. Finally, defendants contend that plaintiffs' sixth claim, alleging unjust enrichment, must be dismissed insofar as it relates to conduct occurring before October 22, 2007, as claims of unjust enrichment are subject to a six-year statute of limitations.

In response, plaintiffs argue that defendants' motion to dismiss plaintiffs' claims as time-barred is premature and any arguments regarding the running of the statute of limitations "are more appropriate for a summary judgment motion or for the jury." Plaintiffs' Resistance, #30, at 15. Nevertheless, as a "precaution," plaintiffs argue that they "did not discover, and could not have reasonably discovered, . . . [d]efendants' systematic fraudulent billing scheme, which dated back until at least 2007, until within one year of filing the [c]omplaint." *Id.* Specifically, plaintiffs argue that, based on the Oregon Chiropractic Board's investigation, plaintiffs "obtained sworn statements of former [First Choice] employees on June 7, 2012, and November 11, 2012," and plaintiffs have continued to seek the testimony from former First Choice patients even after filing the October 22, 2013 complaint. *Id.* at 15-16.

Because the analysis differs, I first examine plaintiffs' first, second, third, fourth, and fifth claims before addressing plaintiffs' sixth claim, which alleges unjust enrichment.

        **a.**      **First, Second, Third, Fourth, and Fifth Claims**

Under Oregon and federal law, the "discovery rule" operates to toll the commencement of the statute of limitations applicable to certain types of claims until:"'(1) the date of the plaintiff's *actual discovery* of injury; or (2) the date when a person exercising reasonable care *should have discovered* the injury, including learning facts that an inquiry would have disclosed.'" *Rice v.*

*Rabb*, 354 Or. 721, 725, 320 P.3d 554, 556-57 (Or. 2014) (citation omitted); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 645 (discussing the "'discovery rule'"). The discovery rule applies to UTPA claims, common-law fraud claims, RICO claims, and ORICO claims. *See* ORS § 646.638(6) (providing that a UTPA claim "must be commenced within one year after the discovery of the unlawful method, act or practice"); ORS § 12.110(1) (providing that an action for fraud must be filed within two years of the date the plaintiff knew or should have known of the fraud); *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) (discussing the "'injury discovery' statute of limitations rule," which provides that "'the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action'" (citation omitted))[5]; *Penuel v. Titan/Value Equities Grp., Inc.*, 127 Or. App. 195, 200, 872 P.2d 28, 31 (Or. Ct. App. 1994) (noting that an ORICO cause of action accrues when the plaintiff "discovered or, in the exercise of reasonable diligence, should have discovered that they had been damaged and the cause of the damage"). Ordinarily, the question of when a plaintiff should have discovered an injury is a question of fact; however, a court may decide the issue as a matter of law if "the only conclusion that a reasonable trier of fact could reach is that the plaintiff knew or should have known the critical facts at a specified time." *Doe 1 v. Lake Oswego Sch. Dist.*, 353 Or. 321, 333, 297 P.3d 1287, 1295 (Or. 2013).

Here, I agree with plaintiffs that defendants' statute-of-limitations argument with regard to plaintiffs' first, second, third, fourth, and fifth claims is premature. Defendants again misconstrue

---

[5] I note that the Supreme Court has rejected the "injury and pattern discovery rule . . . , under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity." *Rotella v. Wood*, 528 U.S. 549, 553 (2000). The Ninth Circuit, however, has stated that "the Supreme Court has explicitly reserved the question of whether" the Ninth Circuit's "'injury discovery'" standard is correct. *Pincay*, 238 F.3d at 1109.

plaintiffs' allegations, suggesting that plaintiffs allege that the fraudulent nature of the insurance claims is apparent on their face. As I note above, however, plaintiffs merely allege that, when viewing all of the bills together, defendants' fraudulent practices are apparent. Given that plaintiffs are nine different insurance companies and that the fraud occurred over many years, there is no suggestion in the complaint that plaintiffs should have seen this pattern in billing, and, thus, discovered that they had paid claims for treatment that was not provided or was not medically necessary, prior to October 22, 2012—that is, within one year of the filing of the complaint. I note that plaintiffs allege in the complaint that the Oregon Chiropractic Board began investigating First Choice sometime in 2011. However, it is not clear when plaintiffs became aware of the investigation. Thus, because the running of the statute of limitations is not apparent from the face of plaintiffs' complaint, defendants' request that the court dismiss in part plaintiffs' first, second, third, fourth, and fifth claims as time-barred should be denied.

### b.    Sixth Claim

In their sixth claim for relief, plaintiffs allege that, because defendants "knowingly billed for services that were not performed as billed and were not medically necessary, the circumstances are such that it would be inequitable to allow . . . [d]efendants[] to retain the benefit of the amounts paid." Complaint, #10, ¶ 84. Both parties cite to *Angelini v. Delaney*, 156 Or. App. 293, 966 P.2d 223 (Or. Ct. App. 1998), for the proposition that unjust-enrichment claims are subject to a six-year statute of limitations. In *Angelini*, the Oregon Court of Appeals noted that, because "[u]njust enrichment is an equitable claim," it is subject to the defense of laches. *Id.* at 305, 966 P.2d at 229. To prevail on such a defense, a defendant must show:

> (1) [the plaintiff] delayed asserting [its] claim for an unreasonable

> length of time, (2) with full knowledge of all relevant facts (and
> laches does not start to run until such knowledge is shown to
> exist), (3) resulting in such substantial prejudice to [the defendant]
> that it would be inequitable for the court to grant relief.

*Id.*, 966 P.2d at 229 (quoting *Mattson v. Commercial Credit Bus. Loans, Inc.*, 301 Or. 407, 419,

723 P.2d 996, 1003 (Or. 1986)).  The Oregon Court of Appeals went on to state that, if "the

statute of limitations period for the analogous action at law has run at the time the suit is filed,

the burden shifts to [the plaintiff] to prove the absence of laches." *Id.*, 966 P.2d at 230.  In the

case of unjust enrichment, the Oregon Court of Appeals held that the "most closely analogous

claim . . . is money had and received," which has a six-year statute of limitations. *Id.*, 966 P.2d at

230.

      Here, I find that it is premature to dismiss in part plaintiffs' unjust-enrichment claim on

the basis that it is untimely.  As the Oregon Court of Appeals held in *Angelini*, there is no strict

statute of limitations for unjust-enrichment claims.  Rather, defendants may assert a laches

defense and, if defendants choose to do so, the burden would then shift to plaintiffs to prove that

laches does not apply to conduct that occurred prior to October 22, 2007—six years prior to the

filing of the suit.  Accordingly, defendants' motion to dismiss in part plaintiffs' unjust-enrichment

claim as untimely should be denied.

### 4.    Damages Relating to "Third-Party Claims"

      Finally, defendants move to dismiss plaintiffs' request for $2,096,926 in damages relating

to "third party claims involving First Choice patients." Complaint, #10, ¶ 55.  Defendants

contend that dismissal is warranted because plaintiffs have failed to plead "any facts in support of

[their] demand of damages incurred with respect to third-party claims." Defendants' Motion to

Dismiss and Motion to Strike, #19, at 26.  In response, plaintiffs argue that they have "simply

made a distinction between payments made under PIP coverage to . . . [d]efendants for

[plaintiffs'] insureds' treatment, corresponding to the $3,686.087.00 [sic] amount, and payments

made to . . . [d]efendants for third parties' treatment because the third parties have claims against

[plaintiffs'] insureds, corresponding to the $2,096,926.00 amount."  Plaintiffs' Resistance, #30, at

17.  At oral argument, plaintiffs' counsel clarified that the third-party claims referenced in the

complaint refer to claims made by third parties who were involved in a motor-vehicle accident

with one of the plaintiffs' insureds and, because the plaintiffs' insured was at fault, plaintiffs paid

for the third party's treatment pursuant to the bodily injury liability portion of the insured's

insurance policy, rather than the PIP portion of the policy.

  I find defendants' argument that plaintiffs have failed to plead sufficient facts supporting

their demand for $2,096,926 in damages relating to third-party claims to be persuasive.

Plaintiffs' allegations regarding the fraudulent scheme indicate that defendants specifically

targeted people with PIP coverage.  For instance, plaintiffs allege that, "[s]ince at least as early as

2007, First Choice instituted a protocol that was designed to maximize revenue from individuals

who came into the clinic following motor vehicle accidents *and had PIP coverage available*

*through various insurance policies*."  Complaint, #10, ¶ 2 (emphasis added).  Moreover,

plaintiffs repeatedly reference patients with PIP coverage and describe in detail how defendants'

alleged fraudulent scheme was designed to exhaust, to the extent possible, a patient's PIP

benefits.  *See, e.g., id.* ¶ 9 ("All of this was done as part of an organized scheme to fraudulently

obtain insurance proceeds for treatment that was not reasonable or necessary, and to enrich . . .

[d]efendants by exhausting or substantially reducing the patients' PIP benefits.").  Other than the

Page 23 - FINDINGS AND RECOMMENDATION

singular reference to third-party claims in connection with plaintiffs' request for damages, there are no allegations in the complaint regarding defendants' conduct with respect to third parties who had claims against plaintiffs' insureds. Thus, because there is no factual basis for an award of damages relating to third-party claims, defendants' motion to dismiss should be granted to the extent it seeks dismissal of plaintiffs' demand for $2,096,926 in damages.

### C.     Summary

Consistent with the foregoing, defendants' motion to dismiss should be denied to the extent it requests dismissal for failure to state a claim under Rule 8(a), failure to satisfy Rule 9(b)'s heightened pleading requirement, and failure to sue within the applicable statute of limitations. Defendants' motion to dismiss should be granted to the extent it seeks dismissal of plaintiffs' demand for $2,096,926 in damages, as there are no facts in the complaint to support such a demand. As set forth below, however, plaintiffs should be permitted leave to amend their complaint to add facts necessary to support their demand for damages relating to third-party claims.

## II.    Motion to Strike

### A.     Standard

Federal Rule of Civil Procedure 12(f) provides that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on its own initiative or pursuant to a party's motion. Fed. R. Civ. P. 12(f). The disposition of a motion to strike is within the discretion of the district court. *See Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty.*,

*Ltd.*, 647 F.2d 200, 201 & n.1 (D.C. Cir. 1981) (per curiam); *J&J Sports Prods., Inc. v. Nguyen*,

No. 13-CV-02008-LHK, 2014 WL 60014, at *2 (N.D. Cal. Jan. 7, 2014).

## B.    Analysis

Defendants request that the court strike paragraphs 1 through 18, which detail the alleged

fraudulent scheme, as "redundant" because plaintiffs also describe the scheme in paragraphs 35

through 55.  Defendants further request that the court strike paragraphs 17 and 54, in which

plaintiffs allege:

> During the time period of 2007 through the present, [d]efendants
> have charged for more treatment/modalities in one session than are
> allowed under Oregon law.  The Oregon Workers Compensation
> Statutes allow billing for up to three codes for treatment/modalities
> in one session.  Defendants bill up to five codes for
> treatment/modalities in one session.

Complaint, #10, ¶ 54; *accord id.* ¶ 17.  Defendants contend that, because plaintiffs are not

alleging a workers' compensation claim, these paragraphs are "immaterial" and "impertinent."

In response, plaintiffs argue that defendants "cite no pertinent mandatory authority in

support of their motion to strike."  Plaintiffs' Resistance, #30, at 17.  Plaintiffs further argue that,

with regard to paragraphs 17 and 54, "PIP payments are limited by the workers' compensation fee

schedule" and "billing for more treatment/modalities allowed in one session is also relevant to

[plaintiffs'] unjust enrichment claim."  *Id.* at 18.

For the reasons set forth in plaintiffs' resistance, I find that it is inappropriate to strike

paragraphs 1 through 18 and paragraphs 17 and 54 of the complaint.  First, with regard to

paragraphs 1 through 18, these paragraphs contain information not contained elsewhere in the

complaint and defendants' vague argument that the paragraphs serve only to "condition the

factfinder by needlessly reiterating allegations of a fraudulent scheme that the facts will show never happened and is not in existence," Defendants' Motion to Dismiss and Motion to Strike, #19, at 27, is without merit. With regard to paragraphs 17 and 54, defendants fail to respond to plaintiffs' argument that "PIP payments are limited by the workers' compensation fee schedule" or plaintiffs' argument that the paragraphs are relevant to their claim for unjust enrichment. Plaintiffs' Resistance, #30, at 18. I am not inclined to recommend striking these paragraphs given that they are not clearly immaterial to plaintiffs' claims. Accordingly, defendants' request to strike paragraphs 1 through 18 and paragraphs 17 and 54 should be denied.

## III.    Leave to Amend

Under Federal Rule of Civil Procedure 15(a), "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a); *see also Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) ("In general, a court should liberally allow a party to amend its pleading."). This policy in favor of amendment is "applied with extreme liberality." *Sonoma Cnty. Ass'n of Retired Emps.*, 708 F.3d at 1117 (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)) (internal quotation mark omitted). The Ninth Circuit has cautioned that a court may

> decline to grant leave to amend only if there is strong evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc."

*Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *accord Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)).

Page 26 - FINDINGS AND RECOMMENDATION

In this case, I recommend that the district court dismiss plaintiffs' demand for $2,096,926 in damages relating to third-party claims. I find, however, that plaintiffs should be granted leave to amend their complaint to add allegations relating to these third-party claims. There is no indication that amendment would be futile and no other basis exists for denying plaintiffs leave to amend.[6]

## CONCLUSION

For the reasons set forth above, defendants First Choice, Dr. Bhasin, Coley, Petroff, and Dr. Tajipour's motion to dismiss and motion to strike (#19) should be granted in part and denied in part, defendant Dr. Cool's motion to dismiss and motion to strike (#22) should be granted in part and denied in part, defendants Dr. Davison, Dr. Ingersoll, and Dr. Robins's motion to dismiss and motion to strike (#28) should be granted in part and denied in part, and Dr. Mohabeer's motion to dismiss and motion to strike (#34) should be granted in part and denied in part. The first amended complaint (#10) should be dismissed to the extent it seeks $2,096,926 in damages relating to third-party claims. Such dismissal should be without prejudice and with leave to amend.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

---

[6] If plaintiffs also wish to file with their amended complaint the damages spreadsheet they reference in their resistance and that plaintiffs' counsel discussed at oral argument, they are free to do so; however, I reiterate that I find their current complaint sufficiently detailed to satisfy Rule 9(b)'s heightened pleading requirement.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 21st day of May, 2014.

Honorable Paul Papak
United States Magistrate Judge